UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

UNITED STATES OF AMERICA

        -against-                      88-CR-496-01 (ERK)

LORENZO NICHOLS,

        *Defendant.*
----------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO REDUCE LORENZO NICHOLS'S
<u>SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A)</u>**


                                  Richard Levitt
                                  Zachary Segal
                                  Levitt & Kaizer
                                  40 Fulton Street, 17th Floor
                                  New York, N.Y. 10038
                                  (212) 480-4000
                                  rlevitt@landklaw.com
                                  *Attorneys for Lorenzo Nichols*


January 4, 2023

## Table of Contents

Introduction ..................................................................................................1

I. BACKGROUND ........................................................................................3

    A. New York State Charges ....................................................................3

        1.  Narcotics Offenses: 1985-1988 ....................................................3

        2.  Murder Charges: 1985-1992 ........................................................4

    B. Federal Charges .................................................................................4

        1.  Arrest, Indictment, and Plea: 1988-1989 ....................................4

        2.  ███████████████████████████████ ......................6

    C. Federal Incarceration: 1988-2005 .....................................................8

    D. NYS Incarceration: 2005-2022 ..........................................................9

II. THE COURT SHOULD GRANT COMPASSIONATE RELEASE ...............11

    A. The Court Has Authority to Decide this Motion. ..............................11

    B. Mr. Nichols' Circumstances are Extraordinary
       and Compelling......................................................................................11

        1.  Rehabilitation .............................................................................12

        2.  Conditions of Confinement.........................................................16

        3.  Unaddressed Sentencing Issues .................................................18

            i.  ████████ ...........................................................18

            ii.  USSG § 5G1.3 .......................................................21

    C. The Proposed Reduction is Consistent With § 3553(a).......................25

Conclusion ...................................................................................................26

Table of Authorities

**Cases**                                                                          **Page(s)**

*Concepcion v. United States*, 142 S.Ct. 2389 (2022) ...................................................25

*Reynolds v. United States*, No. 99-CR-520 (NGG), 2022 WL 1444167
    (E.D.N.Y. May 6, 2022)..............................................................................16, 24

*United States v. Amato*, 48 F.4th 61 (2d Cir. 2022) ...................................................19

*United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020) .........................................11, 12

*United States v. Correa*, No. 08-CR-1026 (VEC) 2020 WL 7490098
    (S.D.N.Y. Dec. 21, 2020) .........................................................................11

*United States v. Demeo*, No. 17-CR-545 (KAM), 2022 WL 142345
    (E.D.N.Y. Jan. 15, 2022).............................................................................16

*United States v. Miller*, 116 F.3d 641 (2d Cir. 1997) ...................................................7

*United States v. Miller*, 1996 WL 33661144 (Brief of the United States,
    October 31, 1996) ........................................................................................8

*United States v. Miller*, No. 92 CR 91 (RJD), 2010 WL 1269796
    (E.D.N.Y. Mar. 30, 2010) ..........................................................................7

*United States v. Perdomo*, 927 F.2d 111 (2d Cir. 1991).............................................23

*United States v. Rivera*, No. 86 CR. 1124 (JFK), 2020 WL 2094094
    (S.D.N.Y. May 1, 2020) .............................................................................21

*United States v. Russo*, No. 90-CR-1063, 2022 WL 17247005 (E.D.N.Y.
    Nov. 28, 2022) .....................................................................................13, 16

*United States v. Scarpa*, No. 94-CR-1119-1 (ERK), 2020 WL 6591455
    (E.D.N.Y. Nov. 11, 2020) .............................................................12, 13, 15, 16

*United States v. Trenkler*, 47 F.4th 42 (1st Cir. 2022) .............................................19

*United States v. Tucker*, 404 U.S. 443 (1972) ...........................................................25

**Statutes and Other Authorities**

18 U.S.C. § 3582 ..............................................................................................1

18 U.S.C. § 3585 ............................................................................................24

21 U.S.C. § 848 ...................................................................................................5

First Step Act of 2018 .......................................................................................25

████████████ ...........................................................................................passim

U.S.S.G. § 5G1.3 ......................................................................................*passim*

*1991 Federal Sentencing Guidelines Manual: Chapter Five –
      Determining the Sentence*, United States Sentencing Commission,
      effective November 1991, available at,
      https://www.ussc.gov/sites/default/files/pdf/guidelines-
      manual/1991/manual-pdf/Chapter_5.pdf................................................21

*BOP Modified Operations: In order to mitigate the spread of COVID-
      19, the BOP is operating under the following conditions,* Federal
      Bureau of Prisons, last viewed December 30, 2022, available at,
      https://www.bop.gov/coronavirus/covid19_status.jsp................................16

*COVID-19 Pandemic Response Plan*, Federal Bureau of Prisons,
      published February 7, 2022, available at
      https://www.bop.gov/foia/docs/COVID_Pandemic_Response%20Plan
      _V.pdf......................................................................................................17

https://www.nycpba.org/news-items/post/2022/killer-drug-lord-lorenzo-
      fat-cat-nichols-granted-state-parole-released-to-feds/.............................10

New York State Department of Corrections and Community
      Supervision, Directive No. 8500, Aug. 14, 2019, available at
      https://doccs.ny.gov/system/files/documents/2020/11/8500.pdf ............10

*Monitoring Visit To Clinton Correctional Facility*, Correctional
      Association of New York, published February 2022, available at
      https://static1.squarespace.com/static/5b2c07e2a9e02851fb387477/t/
      627d96476c4e377e0d2e6f84/1652397642479/CANY_Briefing-
      Clinton-05122022.pdf ...........................................................................17

New York Times, Aug. 12, 1988, Peter Kerr, *30 Held in Sweep Against
      Drug Ring Tied to Officer's Killing*, available at,
      https://www.nytimes.com/1988/08/12/nyregion/30-held-in-sweep-
      against-drug-ring-tied-to-officer-s-killing.html......................................5



........................20

........................20

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA,

          -against-                         88-CR-496-01 (ERK)

LORENZO NICHOLS,

          *Defendant.*
--------------------------------------------------------X

### MEMORANDUM OF LAW OF SUPPORT
### OF LORENZO NICHOLS' MOTION TO REDUCE
### SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A)

**<u>Introduction</u> –** Lorenzo Nichols has been incarcerated since 1985, a period of 37 years. When he was initially jailed in 1985, then 26-years old, Nichols was known as "Fat Cat" and was the principal of the Nichols Enterprise, an illegal entity that sold drugs, and engaged in violence throughout Jamaica Queens. The "Fat Cat" days, however, are far behind Nichols, who, in April 2022, was granted parole from his New York State conviction for multiple counts of, *inter alia*, criminal possession of a controlled substance.

Nichols' grant of parole was not an insignificant event, considering he had been denied parole every year during his previous twelve years of eligibility, notwithstanding his clean institutional record. These multiple denials reflected largely the nature of his state offense (drug trafficking), the related instant federal murder-in-aid of racketeering offense, as well as the murder of Parole Officer Brian Rooney. To prove the sincerity of his efforts to reform himself, and acknowledge the toll his criminal life had taken on his community, Nichols, among other things, had foregone an opportunity to be re-sentenced for his state drug conviction under New

1

York's Drug Law Reform Act, which repealed the notoriously harsh Rockefeller Drug Laws pursuant to which Nichols 25-to-life sentence had been imposed; if he had availed himself of resentencing, he would have faced a statutory minimum of 15 years and a maximum of 30 years. But eventually, after 37 years, his rehabilitation and countless letters of support carried the day with the Parole Board.

Now that he has returned to federal custody, Nichols was surprised to learn that, despite serving 37 years, he has an additional four years to serve on his 40-year federal sentence: although he was brought by writ into federal custody in August 1988 for arraignment on the instance offense, the BOP computed his sentence to begin as of his February 1992 sentencing. ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████.

Nichols, now 64 years old, asks the Court to reduce his sentence by four years or to "time served." Either sentence will not result in his immediate release, as a detainer exists from the State of Florida.[1] But it will assure that — whatever happens

---

[1]     To resolve charges lodged against him by the State of Florida in 2005, Nichols, in 2007, entered a nolo contendere plea on advice of counsel, the terms of which provided Nichols would serve 10 years (running consecutive to his NY and federal offenses) in exchange for his son, the named co-defendant, receiving a sentence of probation. Recently, Nichols learned that his son — who was represented by the same attorney as was Nichols — was cooperating with state authorities when Nichols plead guilty, strongly supporting a claim that Nichols had been denied his right to conflict-free counsel.

with his Florida prosecution — he will be released four years earlier than would otherwise be the case ███████████████████████████████████ ██████ .

The extraordinary and compelling reasons advanced by Nichols in support of his request for a reduction in sentence are (1) he is rehabilitated, (2) the conditions of confinement during COVID, and (3) unaddressed sentencing issues including ██████ ██████████████████████████████████████████████████████████ ██████████████████████████ , and (ii) the Court's failure to credit Nichols with four years of pre-sentence custody under U.S.S.G. § 5G1.3. The requested sentencing reduction would also be consistent with the § 3553(a) factors.

For the reasons that follow, this Court should reduce Nichols' sentence to 36-years or to time served.

## I. BACKGROUND

Tracing the procedural history of Nichols' case is perhaps better suited for an investigative report than a legal memorandum considering it spans nearly 40 years. Making matters more difficult, many records are missing or are otherwise no longer available. Nevertheless, we summarize below those facts relevant to the instant motion, for which we have found corroborating documentation.

### A. New York State Charges

**1. Narcotics Offenses: 1985-1988.** According to the PSR, in "late 1985, the Federal Bureau of Investigation, the Drug Enforcement Administration, and the New York City Police Department" began investigating a drug-distribution network in the "vicinity of 159th Street and 107th Avenue in the Jamaica section of Queens, New

3

York." PSR ¶ 7. Following several successful buy-busts, the aforesaid federal and state law enforcement agencies learned that this network, which dealt heroin, cocaine, and crack, was run by Lorenzo Nichols. Nichols, the investigation revealed, ran this organization out of Big Mac's Deli. *Id.* In July 1985, NYPD arrested Nichols at Big Mac's Deli. PSR ¶ 30. He was thereafter charged in Queens County, under Indictment Number 3945-85, with, *inter alia*, multiple counts of criminal possession of a controlled substance, in varying degrees. PSR ¶ 88. To pay for his mounting legal fees, among other reasons, Nichols continued selling narcotics following his 1985 arrest. PSR ¶ 57 ("defendant acknowledged that he 'kept his hand in the cookie jar' by selling narcotics wholesale on consignment."). Nichols was convicted in January 1988, and in February 1988 sentenced to 25 years to life imprisonment. PSR ¶ 88.

**2. Murder Charges: 1985-1992.** Nichols was admitted to bail following his July 1985 arrest. A week later, however, his parole officer, Brian Rooney, violated Nichols and so he was returned to custody. PSR ¶ 30. On October 10, 1985, PO Rooney was murdered in his car. PSR ¶ 31. According to the PSR, Nichols was charged with this murder in 1987. PSR ¶ 94. ███████████████████████, in February 1992 Nichols plead guilty to ordering the murder and was sentenced to 25-life, to run concurrently with the 25 to life sentence imposed consequent to his narcotics convictions.

**B. Federal Charges.**

**1. Arrest, Indictment, and Plea: 1988-1989.** In August 1988, search warrants and arrest warrants were executed by federal agents all throughout Queens, including at Big Mac's Deli. According to a New York Times article, the

criminal complaint alleged Nichols ran this organization.[2] Nichols was already in custody at this time, having been convicted and sentenced in February 1988 on the narcotics case. Pursuant to writ, Nichols was brought into federal custody on August 11, 1988, and ordered to be held "in federal custody under writ." Exhibit A, 1988-92 (Pre-ECF) Docket, at 5.

We could not locate the criminal complaint, the original indictment or several of the superseding indictments, but we did locate the sixth superseding indictment, dated February 10, 1989. The charges therein related to Nichols allege that, between 1986 and 1988, Nichols was a large-scale trafficker in heroin, cocaine, and crack. *See* Exhibit B, S-6, at 1, 2, 6-7. Count Two of the indictment alleged Nichols was the leader of the Nichols Organization, a continuing criminal enterprise under 21 U.S.C. § 848(a).

Later, in September 1989, however, Nichols agreed to plead guilty to an information alleging that, in furtherance of the racketeering activity (*i.e.,* drug trafficking between 1985-88), he ordered the murders of Isaac Bolden and Myrtle Horsham. *See* Exhibit C, Plea Transcript, at 5-7; *see also id.* at 18-20 (Bolden), 20-22 (Horsham). ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

---

[2]     *See* Peter Kerr, *30 Held in Sweep Against Drug Ring Tied to Officer's Killing*, New York Times, published Aug. 12, 1988, available at, https://www.nytimes.com/1988/08/12/nyregion/30-held-in-sweep-against-drug-ring-tied-to-officer-s-killing.html



On February 7, 1992, Nichols was sentenced by this Court to 40 years' imprisonment. *Id.* at 17-18. This term was intended to run concurrent with Nichols' aforesaid state convictions. *See* Doc. 161 ("It was my intention that [Nichols'] federal sentence run concurrently with his state sentence.")[3]

---

[3]      Unless otherwise noted, all citations to "Doc." refer to *United States v. Nichols*, 88-cr-496 (EDNY).





### C. Federal Incarceration: 1988-2005.

Nichols, as mentioned above, had been brought by writ into federal custody in

August 1988. ███████████████████████████████████████████

███████████████████. There does not appear to be any records of Nichols' conduct

while in federal custody during that period except for an excerpt from a letter that

was written by a former attorney of Nichols'. That letter, re-produced in the packet submitted in support of his recent bid for parole, references a hearing in connection with Nichols' administrative segregation designation at which a BOP official, Michael Egan (a BOP employee) provided testimony.[5] Summarizing Mr. Egan's testimony, Nichols' attorney related,

> During the hearing DOCCS held about Lorenzo's secure placement at DOCCS, Mr. Michael Egan (employee of the Federal Bureau of Prisons) testified that Mr. Nichols, while in federal custody, received only 3 minor infractions over 17 years (none involving violence or drugs) and was a model inmate. He further indicated that Nichols was not a management concern and made a good institutional adjustment.

Exhibit G, Parole Packet, at 9.[6]

### D. NYS Incarceration: 2005-2022.

Nichols was returned to NYS custody in 2005 to continue serving his 25-life sentence. In 2010, Nichols became eligible for parole, having served 25 years of the aforesaid sentence, imposed in 1985. About five years earlier, in 2005, Nichols became eligible for a re-sentencing under the Drug Law Reform Act, which abolished the Rockefeller Drug Laws under which Nichols was initially sentenced. He declined to be re-sentenced because, as he told the Parole Board, he believed his sentence was just. *See* Exhibit G, Parole Packet, at 17. According to an evaluation filed with his 2020 Parole Packet by a respected expert on NYS criminal sentencing, Nichols, had he availed himself of re-sentencing, would have faced a maximum term of 30-years'

---

[5]     Exhibit G, the Parole Packet, is extensive and details his prior parole hearings, letters of support, and institutional adjustment.

[6]     The undersigned could not locate the transcript of the hearing.

imprisonment, assuming the court would have run his sentences concurrent as it did in 1988. *See* Exhibit H, Rockefeller Drug Law Analysis, at 2,7. By 2020, Nichols had been incarcerated for 35 years, five years longer than the statutory maximum he faced under the Drug Law Reform Act.

Between 2010 and 2021, Nichols was repeatedly denied parole, citing, generally, his crimes of convictions, including his federal convictions. *See e.g.,* Exhibit G, Parole Packet, at 13-18 (excerpts from the Parole Board's 2016, 2018, 2019, 2020, and 2021 denials mentioning federal conviction).[7] Additionally, there was strong opposition for granting parole by the Police Benevolent Association. *Id.* at 46 (overview of community opposition).[8]

There was little question, however, that Nichols had adjusted well to incarceration. As a precursor to parole, DOCCS prepares a Correctional Offender Management Profiling for Alternative Sanctions ("COMPAS") report, which is used, among other purposes, to determine risk assessment and re-entry plans.[9] Nichols'

---

[7]     The Queens DA Office repeatedly opposed parole, also citing Nichols' federal murder-in-aid of racketeering convictions. *See* Exhibit J, DA Opp., at 2, 4. Both letters also cited Nichols' involvement in the Rooney murder.

[8]     After Nichols was granted parole, the PBA re-published an article in the New York Post criticizing the grant due to Nichols' federal convictions and role in the Rooney murder. The article also quoted a retired detective who worked on the investigation into the murder of Officer Edward Byrne and said releasing Nichols would be "outrageous" given that Nichols' organization was "responsible for the assassination of Police Officer Edward Byrne." Nichols was never charged with being involved in this murder. The article is accessible here: https://www.nycpba.org/news-items/post/2022/killer-drug-lord-lorenzo-fat-cat-nichols-granted-state-parole-released-to-feds/

[9]     *See* Directive No. 8500, New York State Department of Corrections and Community Supervision, published Aug. 14, 2019, available at https://doccs.ny.gov/system/files/documents/2020/11/8500.pdf

2021 COMPAS report ranked as "Low" his "Risk of Felony Violence", "Arrest Risk", and "Abscond Risk". Exhibit I, COMPAS, at 1. The disciplinary history section marked as "No" whether "this person has ever received Tier 2 or 3 disciplinary infractions for fighting/threatening other inmates or staff", *id*. at 3; it also marked "No" in response to "Does this person appear to have notable disciplinary issues?" *Id*. at 4. The undersigned could not locate the decision granting Nichols parole.

## II. THE COURT SHOULD GRANT COMPASSIONATE RELEASE

### A. The Court Has Authority to Decide this Motion.

"[A] defendant may go to court 'after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]'" *United States v. Brooker*, 976 F.3d 228, 233 (2d Cir. 2020) quoting 18 U.S.C. § 3582I(1)(A). Here, Nichols submitted his request to the warden at MDC Brooklyn on July 15, 2022. *See* Doc. 168 at 2; *see also* Doc. 163. More than 30-days have elapsed since this request was made. Therefore, this Court should consider the merits of this motion.

### B. Mr. Nichols's Circumstances are Extraordinary and Compelling.

The Second Circuit's decision in *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020), endowed district courts with "near absolute discretion in determining what constitutes an extraordinary and compelling circumstance warranting relief when deciding motions brought directly by a defendant." *United States v. Correa*, No. 08-CR-1026 (VEC) 2020 WL 7490098, at *3 (S.D.N.Y. Dec. 21, 2020). Practically, this

means district courts are free to "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before it." *United States v. Scarpa*, No. 94-CR-1119-1 (ERK), 2020 WL 6591455, at *1 (E.D.N.Y. Nov. 11, 2020) quoting *Brooker*, 976 F.3d at 237. The only "statutory limit on what a court may consider to be extraordinary and compelling is that '[r]rehabilitation... *alone* shall not be considered an extraordinary and compelling reason.'" *Brooker*, 976 F.3d at 238. However, rehabilitation can be considered along with other factors. *See Scarpa*, *supra*, at *1.

As discussed above, three circumstances, considered together, are extraordinary and compelling: (1) he is rehabilitated, (2) the conditions of confinement during COVID, and (3) unaddressed sentencing issues including ████ ███████████████████████████, and (ii) the Court's failure to credit the four years of pre-sentence custody under § 5G1.3. These circumstances are discussed in turn.

### 1. Rehabilitation

Rehabilitation is often cited as a factor in finding extraordinary and compelling circumstances. For example, in *United States v. Scarpa*, this Court granted compassionate release to a defendant that received a 482-month sentence for, *inter alia*, his involvement in "several conspiracies to commit murder." *Scarpa*, 2020 WL 6591455, at *2 (E.D.N.Y. Nov. 11, 2020). In addition to declining health, this Court pointed to the defendant's rehabilitation in finding the existence of extraordinary and compelling circumstances, the evidence of which was his lack of disciplinary infractions over 20 years of incarceration ████████████████████████

████████████████████████████████████████████

████████████████. *Id.* More recently, Judge Block, in *United States v. Russo*, cited rehabilitation in granting compassionate release to a defendant 29 years into a life sentence imposed for, *inter alia*, two murder-in-aid of racketeering convictions. *See United States v. Russo*, No. 90-CR-1063, 2022 WL 17247005, at *4 (E.D.N.Y. Nov. 28, 2022). Unlike in *Scarpa*, ████████████████████████████████ ████████████████ but rather maintained a clean disciplinary record, and had multiple letters of support attesting to the defendant's growth.

Here, as the quoted testimony by the BOP called to testify for Nichols' makes clear, Nichols was a "model inmate" during the first 17 years of his incarceration. *See* Exhibit G, Parole Packet, at 9. The next 20 years in NYS custody, per his COMPAS Report, were equally impressive. *See* Exhibit J, Compas Report, at 1-13. Indeed, various statements Nichols made to the Parole Board and the various letters submitted on his behalf attesting to his rehabilitation confirm that Nichols was not just good on paper.[10] To give the Court a feeling of the person Nichols has grown into from the 26-year-old arrested so many years ago, here is an excerpt from a letter he wrote to the Parole Board in December 2021:

> I, Lorenzo Nichols, am writing to sincerely apologize to my victims, their families, friends, and to the community for all the anguish, and fear I have caused. I also would like to apologize to Mr. Brian Rooney's family, friends, and colleagues for his death. I am remorsefully aware of the pain and suffering they will carry for the rest of their lives.

---

[10]   For personal letters describing Nichols' transformation over his 37 years of incarceration, we direct the Court to the Parole Packet (Exhibit G) at pages 19-27 (excerpts of Nichols' statements and letters expressing remorse), 27 (2019 letter from a NYS Correctional Officer), and 27-46 (excerpts from various letters of support submitted by family, friends, and organizations from 2018 through December 2021).

Please understand that it was never my intentions. Words cannot express how remorseful I am, or how I deeply regret everything that happened to Mr. Rooney's and his family. I hold myself accountable for my disastrous behavior. I truly apologize. I know it is difficult to heal from these traumatic events. However, I can only pray and hope to convey my repentance, bring closure to my victims' families, and help prevent others from making the same mistakes as I did.

As a young man, I did not understand the concept of civic and moral values. My mother and family believed in providing us with the basic necessities in life. They didn't have the knowledge to equip us with the tools for success. I began looking up to the wrong people. I started taking short cuts by selling drugs. The thought of drugs destroying lives and the community never crossed my mind. I was too focused on making money that I didn't see the deadly danger of that lifestyle.

My oldest sister, Marty Nichols, everyone called her Baby Sister. She was killed in a firebomb attack at our mother's house by rivals who were targeting my associates. I choose the wrong path out of greed and ignorance, it cost me everything. I was not able to physically help raise my children. I've been divorced twice while in prison. I was not able to attend any funerals. My mother, father, stepfather, two sisters, my nephew, and youngest niece whom I help raised, have all passed away since I've been incarcerated. The Lord knows, if I could do it all over again, I would choose a different path.

The past 36 years has given me a lot of time to reflect and be honest with myself that selling drugs was no short cut to success. There is nothing smart, or glorious about being a drug dealer. I now realize how young and ignorant I was; I take full accountability for my actions that left a trail of destruction and tore many families apart.

I've spent nearly 37 years in prison. I am not that 26-year-old who violated parole and committed those heinous crimes. I am now 62, soon will be 63 in a couple days. I threw away my life with my senseless, reckless, actions. I can only pray and hope for an opportunity to start a second chapter in my life.

Exhibit G, Parole Packet, at 20-21. Nichols has not just been writing letters, however.

He has been a motivating force in bringing the community together, even during the

most difficult of times. As explained by Yamara Brown, Minister of the Evangelistic

Ministries Church:

> During the George Floyd protest, there was an issue of defunding the
> police. I thought brother Nichols would agree with the majority.
> However, his words of encouragement calmed many minds, he stated,
> "Defunding the police is a bad idea, police need more training, and the
> focus should be on building police-community relationships". He is a
> humanitarian who is hopeful that one day we will all come together,
> stop destroying ourselves, the earth, and think about making the world
> a better place for generations to come.

*Id.* at 38; *see also id.* at 43-44 (letters from activists doing human rights work in

Afghanistan detailing Nichols' role in their lives). Nichols' contrition and action

towards repairing the damage he caused has earned him the support of even a

National Board Member for the NAACP, who wrote the Parole Board explaining, "I

think we will be able to use Mr. Nichols to help many others in New York and

throughout this nation to help youth that are off track and help change their young

lives in the right direction." *Id.* at 43. The NAACP also promised to help Nichols find

employment through its programs to help formerly incarcerated persons re-integrate

upon release. *Id.*

But Nichols' transformation, including his realization that to repair the

damage he caused requires that he help to rebuild the community he brought so much

pain to,



### 2. Conditions of Confinement

This Court's ability to consider the restrictive conditions of confinement occasioned by COVID-19 has been well established, by a litany of cases. *See e.g., Russo*, 2022 WL 17247005, at *6 ("the restrictions ... during the pandemic have made Russo's incarceration much more punitive than originally contemplated at the time of sentencing"); *see also Reynolds v. United States*, No. 99-CR-520 (NGG), 2022 WL 1444167, at *4 (E.D.N.Y. May 6, 2022) (same, collecting cases).

Here, since April 2022, Nichols has been held at Brooklyn MDC, a facility that has been notorious for its poor handling of the pandemic. Indeed, as of this writing, the MDC continues to practice Level 3 Operations in response to the pandemic,[12] "the most severe, due to the community transmission rate being higher than 100 per 100,000 over the last 7 days." *United States v. Demeo*, No. 17-CR-545 (KAM), 2022 WL 142345, at *4 (E.D.N.Y. Jan. 15, 2022) ("the current conditions at MDC Brooklyn

---

11



12      *See BOP Modified Operations: In order to mitigate the spread of COVID-19, the BOP is operating under the following conditions,* Federal Bureau of Prisons, last viewed       December       30,       2022,       available       at, https://www.bop.gov/coronavirus/covid19_status.jsp

support finding that extraordinary and compelling reasons exist in this case.") Of the 97 BOP facilities, MDC is one of fourteen currently practicing the most restrictive measures. These measures include, but are not limited to, limitations on healthcare ("When an institution is functioning at Level 3 operations, health care services may be limited to urgent health care needs and routine services may be postponed as clinically appropriate."), limitations on recreation (3 times a week for 1 hour, but no group sports or use of gym equipment), and limitations on food service (encourage providing meals inside housing units or cells).[13]

Before arriving at MDC, Nichols was confined at Clinton Correctional Facility, the conditions at which were no better than those at MDC, as evidenced by a February 2022 report published by the Correctional Association of New York ("CANY")[14]:

> CANY's monitoring visit to Clinton revealed an antiquated facility that is failing to provide adequate services for the incarcerated population housed there. Reports from incarcerated people uncovered extensive issues with medical, dental, and mental health services caused by critical staff shortages, substandard care, and a punitive environment that responds to healthcare needs with punishment. The occurrence of three deaths at the facility within the course of 30 days in June and July 2021, as well as a high rate of attempted suicide, with 17.6% (18 incidents) of attempted suicides systemwide occurring at Clinton Correctional Facility from November 2019 to December 2020, indicate a severe inability in the prison's ability to prevent death by suicide or other means and in providing medical and mental health care for incarcerated individuals.

---

[13]     *See COVID-19 Pandemic Response Plan*, Federal Bureau of Prisons, published February 7, 2022, available at https://www.bop.gov/foia/docs/COVID_Pandemic_Response%20Plan_V.pdf (*see* pp. 91, 101, 102 of PDF).

[14]     *Monitoring Visit To Clinton Correctional Facility*, Correctional Association of New York, published February 2022, available at https://static1.squarespace.com/static/5b2c07e2a9e02851fb387477/t/627d96476c4e3 77e0d2e6f84/1652397642479/CANY_Briefing-Clinton-05122022.pdf (p.2)

Whereas the Court likely could have foreseen unusual limitations on Nichols'
confinement (including, for example, restricting family visits) ███████████████
█████████████ certainly the conditions under which Nichols has served these
past nearly three years due to the COVID-19 pandemic could not have been foreseen.

### 3. Unaddressed Sentencing Issues

It can hardly be doubted that the 37 years Nichols has spent incarcerated is a
very long time. To put it into perspective, at 64 years old, Nichols has spent nearly
60% of his life – and nearly all his adult life – behind bars. Nichols, however,
understands the severity of his conduct required a strong message be sent. So much
so that he forfeited a potential opportunity for release from NYS Custody in 2015 by
declining to apply for re-sentencing under the Drug Law Reform Act.[15] But Nichols'
decision to do so is relevant not just because it shows his remorse, but also because it
effectively delayed his ability to learn of and address two issues that likely would
have resulted – and should still result – in a sentencing reduction: the dual failures
to follow up on the ████████████████████████████ and to provide him
credit for his federal pre-sentence custody.

   **i.   ██████████**

   ████████████████████████████████████████████████████
   ████████████████████████████████████████████████████
   ████████████████████████████████████████████████████

---

[15]    As discussed above, Nichols, if re-sentenced to concurrent time, faced a
statutory maximum of 30 years imprisonment, which, having been incarcerated since
1985, would have resulted in his release from DOCCS and transfer to BOP custody
in 2015. *See* Exhibit H, Rockefeller Analysis, at 2.







### ii.   U.S.S.G. § 5G1.3

Another un-addressed issue that could provide relief to Nichols is the absence of an adjustment under U.S.S.G. § 5G1.3(b) at the time of sentencing to account for the four years Nichols spent in pre-sentence federal custody between 1988 and 1992. That Guideline provision, as reflected in the 1991 Sentencing Guidelines Manual,[20] states,

> **(b)** If subsection (a) does not apply, and the undischarged term of imprisonment resulted from offense(s) that constituted part of the same course of conduct as the instant offense and have been fully taken into account in the determination of the offense level for the instant offense, …, the sentence for the instant offense shall be imposed to result in a combined sentence equal to the total punishment that would have been imposed under §5G1.2 (Sentencing on Multiple Counts of Conviction) had all the sentences been imposed at the same time.

Application Note 2 explains when such an adjustment would be appropriate:

---

[19] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[20] *See 1991 Federal Sentencing Guidelines Manual: Chapter Five – Determining the Sentence*, United States Sentencing Commission, effective November 1991, available at, https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1991/manual-pdf/Chapter_5.pdf (*see* pp. 32-33).

> Second, it applies if the conduct resulting in the undischarged term of imprisonment was part of the same course of conduct as the instant offense and has been fully taken into account in determining the offense level for the instant offense (<u>e.g.</u>, where a defendant is prosecuted in both federal and state court for the same criminal conduct; or where a defendant is prosecuted in federal and state court for different criminal transactions that are part of the same course of conduct, such as two drug sales, but the conduct underlying both transactions is fully taken into account under §1B1.3 (Relevant Conduct) in determining the offense level for the instant offense).

*See* fn. 20, *supra*, at 33. Application Note 3 goes on to explain that the sentence to be imposed in such a situation "should adjust for any term of imprisonment already served as a result of the conduct taken into account in determining the instant sentence (<u>e.g.</u>, if the appropriate total punishment determined under this subsection for all offenses is 30 months and the defendant has already served 10 months of the prior undischarged term of imprisonment, the court should impose a sentence of 20 months concurrent with the prior undischarged term)." *See* fn 20, *supra*, at 33.

Since 1991, § 5G1.3 has been amended by adding to section "b" subsection "1" which requires the court to "adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment *if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons*[.]" U.S.S.G. § 5G1.3(b)(1) (emphasis added) ("the court shall adjust…[.]"); *cf.* fn. 20, *supra*, at 33 (Application Note 3: "the court should adjust[.]")

In February 1988, Nichols was sentenced in New York State to 25-life for drug offenses. A few months later, in August 1988, Nichols was brought by writ into federal custody where he was arraigned on the instant offense conduct, charging, *inter alia*, racketeering activity involving drug distribution between 1986 and 1988. Exhibit A,

1988-92 (Pre-ECF) Docket, at 2. In October 1988, this Court noted in a docket entry that it did not expect the BOP would credit Nichols for his pre-sentence confinement given the undischarged NYS 25-life sentence. *Id.* at 8 ("if there is reversal in the state appeal [Nichols] will be given credit for time he was held at MCC for federal proceedings.") Nichols ultimately plead guilty to two murders committed in aid of the aforesaid racketeering. ███████████████████   ████████████████████████ ████████████████████████   *See* Exhibit E, Nichols J&C, at 4. Nichols should have been credited for his pre-trial confinement under § 5G1.3(b) because the conduct underlying his state court conviction was relevant conduct to his federal offense of conviction.

The conduct underlying the federal charges was a mere continuation of the offenses of which Nichols was convicted in New York State and thus relevant conduct per §1B1(a)(1). As stated in the PSR, under the heading "Offense Conduct," the Nichols Enterprise, the entity named in the Information to which Nichols plead guilty, existed continuously "between 1981 and Nichols' arrest on federal charges in August 1988[.]" PSR ¶ 9. The entity also continuously operated out of Big Mac's Deli. The nature of the Enterprise as a wholesale distributor of heroin and cocaine also remained unchanged between 1981 and 1988. PSR ¶ 12. Indeed, the PSR further notes that even after his 1985 NYS arrest, "defendant acknowledged that he 'kept his hand in the cookie jar' by selling narcotics wholesale on consignment." PSR ¶ 57. The conduct for which Nichols was arrested in 1985, in other words, continued unabated, and without change, until his arrest in 1988. *Cf. United States v. Perdomo*, 927 F.2d 111, 115 (2d Cir. 1991) (sales of same drug, cocaine, were part of same course of

23

conduct despite different conspiracies with different members and methods, and despite four-month interval between sales).

As the Court correctly predicted, the BOP did not credit the four years Nichols spent in federal pre-sentence custody, evidenced by Nichols' BOP computation sheet stating Nichols' 40-year sentence commenced in February 1992, *i.e.,* the date of his federal sentencing. *See* Doc. 168 at 4. This was not necessarily error, however, as the BOP was not required to credit the four years Nichols spent in federal pre-sentence custody because it was being credited to his 25 to life New York State sentence. *See* 18 U.S.C. § 3585(b).[21] Even so, this Court is free to consider its failure to "adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment", § 5G1.3(b), in finding extraordinary and compelling circumstances. *See Reynolds v. United States*, No. 99-CR-520 (NGG), 2022 WL 1444167, at *3 (E.D.N.Y. May 6, 2022) ("Reynolds's argument is convincing insofar as '[t]he purpose of § 5G1.3 is to prevent double-counting of the same conduct in two separate sentences.'"). Alternatively, the Court can consider the non-retroactivity of the

---

[21]     18 U.S.C. § 3585(b) provides:

> **(b)Credit for Prior Custody.—**A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences—
>> **(1)** as a result of the offense for which the sentence was imposed; or
>> **(2)** as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;
>>> that has not been credited against another sentence.

amendment to § 5G1.3, which today explicitly directs courts to adjust a sentence to credit a period of confinement if the court believes the BOP will not do so.

<div align="center">***</div>

For all these reasons, this Court should find Nichols' circumstances extraordinary and compelling.

## C. The Proposed Reduction is Consistent with § 3553(a).

The United States Supreme Court recently provided guidance on the role played by the § 3553(a) factors in deciding motions for a reduction of sentence brought under the First Step Act: "[A] federal judge in deciding to impose a sentence 'may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.' *United States v. Tucker*, 404 U.S. 443, 446 (1972). The discretion federal judges hold at initial sentencings also characterizes sentencing modification hearings." *Concepcion v. United States*, 142 S.Ct. 2389, 2399 (2022). Particularly relevant here, the Supreme Court said,

> When a defendant appears for sentencing, the sentencing court considers the defendant on that day, not on the date of his offense or the date of his conviction. *Pepper v. United States*, 562 U.S. 476, 492, 131 S.Ct. 1229, 179 L.Ed.2d 196 (2011).

*Id.* at 2396.

Nichols, through many, many years of reflection now understands and can articulate the harm his criminal conduct had on the community at large. He has devoted his efforts towards repairing the damage he caused by sharing his experience with the public through religious organizations and community organizations alike.

He has lent a helping hand to many inmates adjusting to the difficulty of incarceration while simultaneously helping them steer clear of the life of crime that condemned him to spending, so far, nearly 60% of his life behind bars. *See e.g.*, Exhibit G, Parole Packet, at 40 (letter from Miguel Ortiz), 41 (letters from Jeremy Fulton and Paul Leitgeb), 42 (letter from Brian Martin) 43 (letter from Paz Ludwig). And his risk assessment reports provide that he is not a danger to the community, which he will not even return to until he completes the 10-year sentence in Florida.

Thirty-seven years of continued imprisonment is a very long time. It is also three years longer than the 34 years an inmate would ordinarily serve on the 40-year sentence Nichols received. A reduction of four years or to a sentence of time served, for all the reasons discussed above, would therefore be consistent with the goals of sentencing.

## Conclusion

For all these reasons, this Court should reduce Nichols' sentence to thirty-six years or time served.

Dated:   January 4, 2023

<div style="margin-left: 50%;">

Respectfully submitted,

_____
Richard Levitt
Zachary Segal
LEVITT & KAIZER
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 480-4000
rlevitt@landklaw.com
*Attorneys for Lorenzo Nichols*

</div>